UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA ALLEN, | ) | Case No. 1:12CV1659 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | (Magistrate Judge Kenneth S. McHargh) |
| CUYAHOGA COUNTY, | ) | |
| et al., | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |
| | ) | MEMORANDUM |
| | ) | AND ORDER |

McHARGH, Mag. J.

The plaintiff Patricia Allen ("Allen"), as administrator of the estate of Albert Fabian ("Fabian"), filed a complaint against Cuyahoga County, several named entities, and twenty-five named individuals. The complaint arose from Fabian's death by suicide on June 28, 2010, while in pre-trial custody at the Cuyahoga County Jail. The complaint alleged five causes of action: 1) Deliberate indifference to Fabian's serious medical needs, 42 U.S.C. § 1983; 2) Failure to train, 42 U.S.C. § 1983; 3) Willful, wanton and reckless conduct; 4) Wrongful death, Ohio Rev. Code § 2125.01, et seq.; and, 5) Negligence by jail medical staff, causing wrongful death, Ohio Rev. Code § 2125.01, et seq. See doc. 1.

Numerous defendants have since been dismissed from the suit, see, e.g., doc. 109, 115, leaving as defendants Cuyahoga County, Dyann Corrao, Trini Whitehead, and Christine Dubber ("Dubber").

MOTION TO COMPEL

Allen filed a Motion to Compel Discovery. (Doc. 116.) The County filed a response (doc. 118), and the court held telephone conferences with the parties, on Dec. 17, 2013, and Dec. 23, 2013, which resolved most of the disputes underlying the filing of the motion to compel.

Remaining at issue is the County's assertion of a "peer review privilege" to shield un-redacted disclosure of a single contested document. The parties have briefed this issue, and the court will now address their arguments. See doc. 125, 126.

In her motion to compel, Allen sought documents pertaining to a clinical mortality review of Fabian's death. In response to a request for production, the County had maintained that no such documentation existed. However, Allen contends that "the recent deposition testimony of Christine Dubber, then-health services manager of the jail, reflects that such documentation should exist." (Doc. 116, at 4.)

> The County's response, as relevant to this issue, was as follows:
>
> Plaintiff's counsel claims . . . that he is entitled to some notes made by Chris Dubber because he asked for "any clinical mortality review regarding Albert Fabian's death." If the notes did constitute a "clinical mortality review," which is disputed, they would be privileged as peer review. It should be noted that Plaintiff's counsel had the opportunity to ask Dubber about her review(s) and observations when he deposed her.
>
> \* \* \* \* \*
>
> Plaintiff also asked for "any administrative review" and "any clinical mortality review" of Albert Fabian's death. There are no review documents.

(Doc. 118, at 3-4.)

## A. Factual Background

The record shows that the County revised its policy and procedure entitled "Procedure in the Event of an Inmate's Death," in May 2010. (Doc. 126, Plaintiff's Exhibit ("PX") 1.) Fabian's death occurred in June 2010. The procedures include the following:

> 3. An administrative review will be conducted within 30 days of an inmate death. Reports are gathered from all staff involved in the incident and a short summary of the facts is required. An assessment will be made regarding correctional and emergency response actions surrounding the inmate's death. Areas where facility operations, policies and procedures can be improved will be identified. Corrective actions will be monitored through the correction center's quality improvement program.
>
> 4. A clinical mortality review for each death will be completed within 30 days by a physician to determine the appropriateness of clinical care provided. The findings will be documented and the results of the review will be shared with treating staff. Other critical incidents will be taken into consideration and discussed for similarities and quality improvement initiatives.
>
> 5. If the inmate death is due to suicide, a psychological autopsy will be conducted by the lead psychiatrist or designee within 30 days of the death.

(Doc. 126, PX 1.)

Dubber was deposed on Oct. 4, 2013. Allen has supplied excerpts from the Dubber deposition. (Doc. 126, PX 2.) Dubber was questioned about post-mortem reviews:

> A. Whenever there's a death in custody, and Mr. Fabian's death was in custody, we go through a process where we review the circumstances

surrounding the incident and discuss it.

Q. Was that done with regard to Mr. Fabian?

A. Yes.

Q. Who was involved in that review and discussion?

A. I don't remember all of the participants but it would have been, to my knowledge it would typically involve me, the medical director, director of nursing, assistant director of nursing, either the director of corrections or wardens, the staff that was working at the time of the incident, nurses that were involved in the incident.

Q. Do you have a specific recollection of that occurring?

A. I know I discussed his case at various times, I believe I was at a critical incident review but I couldn't say for a hundred percent sure.

Q. What is a critical incident review?

A. Just basically what I described, where everybody comes together and discusses what happened and, you know, the circumstances surrounding it.

Q. Are there, is there documentation created from that incident review?

A. Just a sign-in sheet for who participates in the review.

Q. And you don't know whether or not you participated in this critical incident review?

A. I can't say with certainty.

\* \* \* \* \*

Q. So you've talked about a psychological autopsy and critical incident review, anything else that was done in the wake of Albert Fabian's death?

A. Not that I recall.

Q. I've seen some reference to a mortality review, was there a mortality review regarding Albert Fabian's death?

>A. That would have been, let me think a minute, it's possible there was a mortality review done, but that's a peer review document also.

(Doc. 126, PX 2, Dubber dep., at 76-77, 80.)

>Q. On those reviews we talked about earlier, administrative review, mortality review, are you required to sign off on those type of reviews to ensure they have been properly done?
>
>A. I do sign off on the mortality reviews. The psychological autopsies, the person doing the review signs off on that.
>
>Q. What about a critical incident review, anything you sign off on?
>
>A. Just on the attendance sheet.
>
>Q. What about an administrative review?
>
>A. Just on the attendance sheet.
>
>Q. Is there anything different between an administrative review and critical incident review?
>
>A. Administrative review is basically looking from a broader perspective at the jail's policies and procedures, whereas a critical incident review kind of drills down to what specifically happened with that particular situation.
>
>Q. Is there documentation other than those sign-in sheets from either of those?
>
>A. No.
>
>Q. But there is for a mortality review?
>
>A. There's a mortality review worksheet.

(Doc. 126, PX 2, Dubber dep., at 116-117.)

On Dec. 19, 2013, as a result of discussions between the parties concerning outstanding and disputed discovery, the County responded as follows concerning the disputed matter at hand:

> Clinical mortality review worksheet, notes re clinical mortality review:
>
> Aside from and without waiving the privilege issues that would pertain to records of this nature: There is no clinical mortality review worksheet per se regarding Albert Fabian's death. The Jail found some notes in Defendant Dubber's hand (redacted copy attached) that Chris says she does not recall making, including whose comments are reflected in her notes.

(Doc. 126, PX 3, at 2.)

The redacted document provided was entitled: "Cuyahoga County Corrections Center Mortality Review Worksheet." (Doc. 126, PX 4.) The attachment consisted of a single-sheet form, which was not filled in (i.e., blank) for the most part. Four sections had been filled in. Under the section "Inmate Name" was written "Fabian, Albert." Three other sections were redacted, as follows:

> Were there any opportunities for improvement in the events immediately surrounding the death? [Matter redacted]
>
> Are there opportunities for improvement in the care provided that might have changed the outcome or prevented the death? [Matter redacted]
>
> Are there any opportunities for improvement in the care that was provided to the deceased individual? [Matter redacted]

(Doc. 126, PX 4.) All of the other sections of the form were blank, including the "Comments" section, as well as the "Reviewed by" and "Date" sections. Id.

### B. Peer Review Privilege

Privileged matters are protected from discovery. Fed. R. Civ. P. 26(b)(1) and (5). The burden of establishing privilege rests with the party asserting it. See, e.g., In re Columbia/HCA Healthcare Corp. Billing Practices Litig., 293 F.3d 289, 294

(6th Cir. 2002), cert. dismissed, 539 U.S. 977 (2003); United States v. Dakota, 197 F.3d 821, 825 (6th Cir. 1999).

The County asserts that "Federal Courts recognize a peer review privilege to protect records of self-critical analysis of medical services in civil rights cases challenging the constitutionality of medical care provided by the government." (Doc. 125, at 6.) Allen, on the other hand, contends that no peer review privilege exists in this federal civil rights case. (Doc. 126, at 4-5.) The burden rests with the County. Columbia/HCA Healthcare, 293 F.3d at 294.

The County urges the court to find support for the peer review privilege in the federal common law, and the fact that the State of Ohio recognizes a statutory peer review privilege. (Doc. 125, at 6.)

> Rule 501 of the Federal Rules of Evidence provides, in relevant part:
>
> "Except as otherwise required by the Constitution . . . or provided by Act of Congress or in rules prescribed by the Supreme Court . . . , the privilege of a witness . . . shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

Fed. R. Evid. 501; see also University of Pennsylvania v. EEOC, 493 U.S. 182, 188 (1990).

In the University of Pennsylvania case, the Supreme Court declined to adopt an academic peer review privilege. University of Pennsylvania, 493 U.S. at 189. The Court stated that, inasmuch as testimonial privileges "contravene the fundamental principle that 'the public . . . has a right to every man's evidence,' " any such privilege must "be strictly construed." Id. (internal citations omitted). See also Trammel v. United States, 445 U.S. 40, 50 (1980); United States v. Nixon, 418

U.S. 683, 709 (1974); Syposs v. United States, 179 F.R.D. 406, 409 (W.D. N.Y. 1998) (privileges disfavored in the law and strictly construed).

The Supreme Court has stated that privileges as "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." Nixon, 418 U.S. at 710; see also In re MSTG, Inc., 675 F.3d 1337, 1343 (Fed. Cir. 2012); In re Subpoena Issued to Commodity Futures Trading Comm'n, 370 F.Supp.2d 201, 208 (D.D.C. 2005). The Court has instructed that "we start with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional." Subpoena Issued to CFTC, 370 F.Supp.2d at 208 (quoting Jaffee v. Redmond, 518 U.S. 1, 9 (1996)).

The Supreme Court has expressed a reluctance to create a new evidentiary privilege, unless it "promotes sufficiently important interests to outweigh the need for probative evidence." University of Pennsylvania, 493 U.S. at 189. The Court stated it was disinclined to exercise the authority provided in Rule 501 expansively. University of Pennsylvania, 493 U.S. at 189; Subpoena Issued to CFTC, 370 F.Supp.2d at 208. The Supreme Court also noted that "balancing of conflicting interests of this type is particularly a legislative function." University of Pennsylvania, 493 U.S. at 189; see also Jaffee, 518 U.S. at 13-14; Syposs, 179 F.R.D. at 411-412.

Given the U.S. Supreme Court's expressed reluctance to expand the parameters of privilege law, it is not surprising that many federal courts in recent years have declined to recognize a number of proposed privileges. See, e.g.,

Subpoena Issued to CFTC, 370 F.Supp.2d at 208 n.8 (citing cases).

The weight of authority in the Sixth Circuit and elsewhere is that no medical peer review privilege exists under federal common law.  Guinn v. Mount Carmel Health Sys., No. 2:09CV0226, 2010 WL 2927254, at *2 (S.D. Ohio Jul 23, 2010).  See also Adkins v. Christie, 488 F.3d 1324, 1328-1330 (11th Cir. 2007), cert. denied, 552 U.S. 1131 (2008) (medical peer review process does not warrant extraordinary protection of privilege in federal civil rights cases); Virmani v. Novant Health Inc., 259 F.3d 284, 289 (4th Cir. 2001); KD ex rel. Dieffenbach v. United States, 715 F.Supp.2d 587, 592 (D. Del. 2010) (balance of authority weighs against recognition of medical peer review privilege); Nilavar v. Mercy Health Sys., W. Ohio, 210 F.R.D. 597, 601 (S.D. Ohio 2002); Syposs, 179 F.R.D. at 411-412.  But see Sevilla v. United States, 852 F.Supp.2d 1057, 1068-1069 (N.D. Ill. 2012) (contra).  The court recognizes that many federal cases discussing a peer review privilege have arisen in the context of employment discrimination and antitrust cases.  Syposs, 179 F.R.D. at 409-410.

Nonetheless, given that privileges are strongly disfavored in federal practice, the liberal view of discovery in the federal rules, and the lack of a historical or statutory basis for a medical peer review privilege under federal law, the court is disinclined to find that the federal common law supports the existence or application of a medical peer review privilege here.  See generally University of Pennsylvania,  493 U.S. at 188-189; Guinn, 2010 WL 2927254, at *2; Dieffenbach, 715 F.Supp.2d at 592; Nilavar, 210 F.R.D. at 601; Syposs, 179 F.R.D. at 411-412.  The County does not point to any Sixth Circuit or Supreme Court precedent which

supports the existence of a medical peer review privilege. See generally Nilavar, 210 F.R.D. at 601.

The County implies that the existence of a medical peer review privilege under Ohio law (and in other states) should support the application of such a privilege in this case. In general, federal privileges apply to federal law claims, and state privileges apply to claims arising under state law. See, e.g., Pearson v. Miller, 211 F.3d 57, 66 (3d Cir. 2000). Where there are federal claims in a case also presenting state law claims, such as this, the federal policy favoring admissibility, rather than any state law privilege, is the controlling rule. Pearson, 211 F.3d at 66 (citing Wm. T. Thompson Co. v. General Nutrition Corp., 671 F.2d 100, 104 (3d Cir.1982)); Guinn, 2010 WL 2927254, at *2 (citing Hancock v. Dodson, 958 F.2d 1367, 1373 (6th Cir. 1992)). Thus, Rule 501 requires the court to apply federal privilege law. Pearson, 211 F.3d at 66; Guinn, 2010 WL 2927254, at *2.

The County relies primarily on two district court cases for its assertion that federal courts recognize a peer review privilege. (Doc. 125, at 7-10.) In Warren v. Sheriff of Cook County, the district court addressed whether the Illinois statutory peer review privilege should be recognized in a case arising under Section 1983, with pendent state law claims. Warren v. Sheriff of Cook County, No. 09CV3512, 2013 WL 5835771 (N.D. Ill. Oct. 30, 2013). The court applied a balancing test, recognizing that evidentiary privileges are not favored, and should be narrowly construed, yet ultimately giving more weight to the factual circumstances of the case. Warren, 2013 WL 5835771, at *4. The court ruled that:

> Plaintiffs have not articulated how [defendants'] peer review procedure

>   and Report would provide a window into the causes of [the inmate's]
>   tragic death that is otherwise unavailable through the evidence
>   already produced.  This court is therefore reticent to subvert the
>   important policy goals of the Illinois peer review privilege in this case.

Warren, 2013 WL 5835771 at *5.

In Veith v. Portage County, the court recognized that "a substantial number of federal courts have declined to expand the federal common law to include a privilege for physician peer review materials." Veith v. Portage County, No. 5:11CV2542, 2012 WL 4850197, at *2 (N.D. Ohio Oct. 11, 2012). The court performed its own analysis of whether a peer review privilege should be recognized, relying on the Supreme Court's analysis in Jaffee v. Redmond, 518 U.S. 1 (1996). The decision in Jaffee was based, in part, on the fact that state courts had recognized a patient-psychotherapist privilege. Jaffee, 518 U.S. at 12. However, another factor, not discussed by Veith, and which is not present in this case, but equally important to the Court's Jaffee ruling, is that Proposed Rule 504, although not adopted by the federal courts, would have recognized a patient-psychotherapist privilege in the Federal Rules of Evidence. Jaffee, 518 U.S. at 14-15; see also MSTG, 675 F.3d at 1345. The Court found this persuasive. Relevant to the issue here, however, a medical peer review privilege was <u>not</u> among the nine specific privileges recommended by the Advisory Committee in its proposed privilege rules. See Jaffee, 518 U.S. at 14; MSTG, 675 F.3d at 1345.

Veith distinguished the "great weight of the federal cases, many of them decided after Jaffee, . . . that such a [peer review] privilege does not exist in the federal common law," Veith, 2012 WL 4850197, at *2 (quoting Nilavar, 210 F.R.D.

at 607), on the basis that many of the cases were not medical malpractice actions, Veith, 2012 WL 4850197, at *3.  Some of the claims before this court may involve some component of malpractice, but the Section 1983 complaint here is not so limited.  For example, one of the Section 1983 claims is a failure to train allegation, which involves the correctional staff  as well as the medical responders.  See doc. 1, ¶¶ 42-45; see also doc. 126, at 6 (relevance to failure to investigate theory).

The court does not find Warren and Veith persuasive in view of 1) the fact that privileges are strongly disfavored in federal practice, 2) the liberal view of discovery under the federal rules, 3) the lack of a historical or statutory basis for a medical peer review privilege under federal law, and 4) the claims at issue in this case.  The court does not find that the federal common law supports the existence or application of a medical peer review privilege here.  See generally University of Pennsylvania,  493 U.S. at 188-189; Guinn, 2010 WL 2927254, at *2; Dieffenbach, 715 F.Supp.2d at 592; Nilavar, 210 F.R.D. at 601; Syposs, 179 F.R.D. at 411-412.  The County does not point to any Sixth Circuit or Supreme Court precedent which supports the existence of a medical peer review privilege.  See generally Nilavar, 210 F.R.D. at 601.  The court finds that the County has failed to carry its burden to establish the privilege.

### C.  Ohio law

Allen also contends that, even if the peer review privilege applied, the document at issue (doc. 126, PX 4) would fail to qualify as privileged under the Ohio statute, Ohio Rev. Code § 2305.252.  (Doc. 126, at 6-8.)  Allen contends that the

statute shields only those documents contained in "the peer review committee's proceedings or records," not the production of a document from its original source. (Doc. 126, at 6-7, quoting Ohio Rev. Code § 2305.252.)

Allen argues that the document comes from Dubber's personal files, not from any peer review file, thus it cannot be privileged under state law. (Doc. 126, at 7; see also doc. 125, DX 3, Dubber decl., at ¶ 9.) According to an undated, unsigned Declaration, Dubber states that "by June 2010[1], the Health Care Center had ceased completing a Mortality Review Worksheet or creating any other written report concerning the substance of the process." (Doc. 125, DX 3, Dubber decl., at ¶ 3.)

Allen also points to the County's December 2013 assertion that no "clinical mortality review worksheet exists." (Doc. 126, PX 3, at 2; see also doc. 125, at 2.)

Because the court has ruled that the County has failed to establish that the federal common law supports the existence or application of a medical peer review privilege here, the court will not venture an interpretation of how the privilege might be applied, had the court found otherwise.


SUMMARY

The motion to compel (doc. 116) is GRANTED in part. As to the only unresolved issue remaining in the motion, the court does not find that the County

---

[1] Apparently, the procedures outlined in the May 2010 revision of the policy entitled "Procedure in the Event of an Inmate's Death," which required the findings of a clinical mortality review to be "documented," were short-lived. (Doc. 126, PX 1, at ¶ 4.)

carried its burden to show that the federal common law supports the existence or application of a medical peer review privilege here. The court's in camera review of the contested document shows that, under the liberal rules of discovery, it is relevant to a party's claim or defense.

Thus, the County is ordered to provide a non-redacted copy of the document entitled: "Cuyahoga County Corrections Center Mortality Review Worksheet" to Allen. (Doc. 126, PX 4.)

IT IS SO ORDERED.

Dated: Feb. 4, 2014 /s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge